## MORAKES *et al. v.* THE STATE.

1. Under the evidence in the case the jury were authorized to find a verdict of guilty against the defendants. The evidence as to venue, though circumstantial in character, was sufficient to establish the allegation that the crime was committed in the county in which it was alleged to have been committed.
2. In the trial of one charged with a crime, the allegation of venue, just as other material allegations in an indictment, must be established beyond a reasonable doubt. The judge's charge upon this subject sufficiently emphasized this principle, and could have left no doubt in the minds of the jury as to the true rule of evidence upon this subject.
3. A complaint in a motion for new trial that the verdict is contrary to a stated part of the charge is equivalent to a complaint that it is contrary to law; and it is without merit where, under the law, the verdict is authorized by the evidence.
4. The evidence offered by the defendants and excluded by the court upon objection of the State's counsel was hearsay, and the court did not err in excluding the same.
5. One ground of the motion for new trial is based upon evidence alleged to have been newly discovered. This evidence was cumulative and impeaching in character, and the court did not err in excluding it.
6. The evidence, though circumstantial, authorized the verdict against all the defendants.

   No. 4119. MARCH 13, 1924. REHEARING DENIED JUNE 25, 1924.

Murder. Before Judge Park. Morgan superior court. November 24, 1923.

*Johnson & Foster,* for plaintiffs in error.

*George M. Napier, attorney-general, Doyle Campbell, solicitor-general, T. R. Gress, assistant attorney-general, A. Y. Clement,* and *T. M. Woods,* contra.

BECK, P. J. John Morakes, John Patros, and Nick Morakes were tried in the superior court of Morgan county under an indictment charging them with the murder, on the 9th day of June, 1923, of one Jim Morakes. The jury trying the case returned a verdict of guilty, with a recommendation. The defendants made a motion for new trial, which was overruled, and they excepted.

1. It is charged in the indictment that the accused killed the decedent by striking him with a blunt instrument, thereby inflicting upon him a mortal wound. The body of Jim Morakes was found near Columbia, S. C., four or five days after the day of the alleged homicide. The evidence shows that he had been hit with some blunt instrument and his skull crushed. There were gunshot wounds found on his person. It is strongly contended that the verdict in this case is contrary to the evidence and without sufficient evidence to support it. Not only the general grounds of the motion are insisted upon, but there are several of the special grounds in which the contention is raised that there was not sufficient evidence to show that the decedent, if he was killed as alleged, was killed in Morgan County. We are of the opinion that there was sufficient evidence submitted to the jury to authorize them to find that the defendants were guilty of the offense as charged, and that the mortal wound from which Jim Morakes died was inflicted in Morgan County. The evidence to establish the essential facts of the alleged offense and the venue of the crime may not be satisfactory to all who read this record. It is not our purpose to set out the evidence in full, nor the substance of the testimony of all the witnesses. The verdict rests upon circumstantial evidence; and the evidence of the witnesses who gave the testimony tending to establish the facts alleged in the indictment is, in many and material respects, strongly contradicted by the testimony of witnesses who were introduced by the defendants. Numerous witnesses were introduced by the defendants, who swore positively that they saw Nick Morakes in Madison on Sunday, June 10th, at such a time as would render it impossible for him to have been near Columbia, S. C., at the hour fixed by the witnesses who testified to having seen him near Columbia, S. C., on Sunday, June 10th. Other witnesses for the defense testified to having seen John Morakes and John Patros in Atlanta, Georgia, on Sunday, the 10th, at such an hour as to contradict the testimony of the witness who testified to having seen the two last named in South Carolina on Sunday morning. If the jury had believed the witnesses for the defendants, that is, those who testified that Nick Morakes was in Madison on Sunday morning and John Morakes and John Patros in Atlanta on that morning, then they

could not have believed the witnesses who testified that these defendants were seen near Columbia, S. C., on Sunday morning.

But one Watkins, who was a dairyman residing near Columbia, S. C., testified that he did see John Patros and John Morakes near Columbia, S. C., on Sunday. He testified that he saw them in an automobile. There was a third man in the automobile, whose head was bound up; and Watkins could not testify whether this third man was living or dead or wounded. These three men were in a moving automobile going in one direction, and Watkins met them as he was going in the other direction. They passed each other going 12 or 15 miles an hour. Watkins also testified that with the automobile containing the three men was another automobile, but he did not recognize the man driving that. He did not recognize the men in the first automobile, but identified two of the men in the court-room, John Patros and John Morakes, as being the men he saw. In part, his language was as follows: "In going in town Sunday morning, June 10th this year, I met some automobiles. About a mile from the city limits of Columbia, from the Capitol about two miles, I met two automobiles. There was something about the people in these cars that attracted my attention. These cars were headed towards my home, going in the opposite direction from the way I came. A man in one of these cars had his head tied up in the front car. I never noticed the make of that car; it was a large car. The road was sandy when I passed these people, and I was going up hill. There were three people in the front car; probably four. They were either seated on the front seat, or all three heads were together, right close together. I am not prepared to say three men were on the front seat. I didn't see definitely but three men. One of the men had a peculiar eye; one had his head tied up—a bandage around the entire face. This rag or cloth was either a dark red, or bloody red, I couldn't say which. This body had a straw hat on. The cars came practically to a standstill when I passed. I have seen a hat which looked very much like that [indicating] on the man's head in the car. I noticed the other two occupants of the car; two of them are here to-day, the man on the left—John Morakes, and the one in the middle—John Patros; and the man with the bandage around his head was the third man. The second car was a small one, I think a Ford. There was only one person in it.

I don't know who that man was. I didn't pay special attention to the rear car. The reason I noticed carefully the people in the first car was because one's head was bandaged up. This was Sunday morning, June 10th. I left home at 7:30 a. m. I met these people in the neighborhood of 7:45."

In connection with the testimony quoted the witness mentioned circumstances that tended to fix the time in his memory. He testified further: "I couldn't say definitely, from the inspection I made, whether it had three men, or possibly four, or whether those three men were on the back seat with their heads pushed over. I could not swear to this jury whether the three men were sitting on the same seat or not. I went on to Columbia, and those other cars continued on their journey. The time I saw this was about 7:45. I was between three and four miles from home. I left home at 7:30. I base my estimate of 7:45 on the time it would take me to drive there. One of the men that I met there had a bandage around his head; a bandage or cloth, either one you choose to call it. He had on a dark suit of clothes; I figure him the third man. He was there on the front seat, or back seat, one or the other. I had never seen that man with the bandage before. I thought he was living at that time. I judged there had been a wreck, from looking at him and the way he was sitting. The other two men were not holding him in any way, that I noticed. My impression was there had been a wreck, and he had probably got hurt. I had not seen these other two men until that time. I was driving very slow, not over ten miles at the outside. They slowed up for me. I don't think I said on the commitment that I was driving twelve or fifteen miles an hour. I would say I was driving approximately eight or ten miles an hour. Their car was traveling very slow when I saw it. They slowed up for me to pass. It was running slow coming down the hill towards me; that hill is pretty steep. This other car was just a short space behind. One man was in that car. I do not know who that man was. The man outside [indicating John Morakes] was at the wheel of the front car. The middle man was just next to him [indicating John Patros]. If I had ever seen these men until I came over here to the commitment, before I met them that Sunday, I don't know it. Certainly I knew what I was over here for —to see could I recognize some men that had been arrested. I

would have known those two men were the ones charged without them coming into court in the custody of the sheriff. I don't know whether they were with the sheriff or the deputy. They brought in three. I don't know whether the description of Nick Morakes had been published in the paper over there. If there was a description of these two men published in the paper immediately after the body of this dead man was found, I read it. I read everything that was published. I don't think I missed a paper. If it was published, I read it." And again the witness testified that he met many automobiles that day; that he did not particularly recall meeting any others that Sunday morning; that he "would not have noticed them if the man did not look like he had his head tied up."

Mrs. J. C. Rivers testified, that she was the wife of the warehouse commissioner of the State of South Carolina; that she lived within three miles of Columbia; that on Sunday, the 10th day of June, she saw two cars on a road which was about 80 feet from her house. She saw the cars at 10 o'clock. One was on a hill, and the other just turning a corner. One of the cars was choked down; they were trying to start it; the larger car was in front; there were two passengers in the front car; there was one in the back car. "They were about 40 yards from me at the time I first saw them. When they got the car started the driver of the front car went on up the hill by my house and within 80 feet of me. The curtains on the front car were down. The curtains were up in the back. The last I saw of these cars after they passed my house, they went on out to the end of the road. I saw them again about ten after eleven, going back this private road; they passed right by my house." She testified that she did not know the make of the first car, but the second was a Ford; that the smaller car was six or eight feet behind the larger car; that Nick Morakes was driving the first car, and (pointing out John Morakes in the court-room) that he was in the first car with Nick.

Tom Jones, sworn for the State, testified: On Saturday evening, June 9th, about four or five o'clock, he was in Madison, Georgia, and he walked in the rear of a Greek café; he saw Nick Morakes and another man in the café; "they were fighting, or playing rough. I heard a jumping around and jabbering, and I didn't understand it, and I looked in there and says,

'I wonder what is the matter with them;' his sleeves were rolled up, and he had his fists hitting like. They were about ten feet from the back door. I didn't stay around there long; I heard the racket, and says to myself, 'I wonder what they are fighting about.' . . That was called the Busy Bee Café, on this side of the street. I suppose there has been a Greek café on the other side of the street. I looked through a screen door, as I passed by. They were talking their talk, I didn't understand it. It might have been a fight. I still say that I heard a noise like rough play or fighting, and talking. That was all the noise I heard. It was that noise that caused me to look in. I wouldn't testify that there wasn't but two men in there as far as I could see. I said on the commitment there were two men, one in front of the other, and the other had his sleeves rolled up and seemed like he was pounding with his fist. I didn't see any more than two men. I don't know the dead man. I had seen him in the street passing backwards and forwards. I took it to be Nick—I wouldn't swear it. Both had on white shirts and were in their shirt-sleeves, neither one had on a coat. One of them seemed like he was fighting. I don't know whether the sleeves on both of them were rolled up. I might have testified on the commitment trial both were in their shirt-sleeves with both sleeves rolled up, I am satisfied one of them's sleeves was rolled up. If I testified both were rolled up on the commitment, that is the way I remembered it at that time. I don't know whether it is usual for a restaurant keeper to keep his sleeves rolled up. They handle food in there, and cook and serve. I know it is nothing unusual to see them with their sleeves rolled up. I said to-day that I saw one of these men hit the other with his fists; I think the one just back of you. There was a lick passed, and I took it to be fighting; that is what I said on the commitment. I know there was a lick passed; I saw it. I was about as far from them as from here to you. I am certain to-day I saw a lick pass; one man hit the other with his fist. I suppose I said that at the commitment trial. If they were fighting they were obliged to hit each other; when I said fighting, I thought everybody knew what that meant."

Evidence was introduced to show that there were bad feelings between Nick Morakes and Jim. There was evidence tending to show that subsequent to the time of the difficulty in the café there

was a dark substance on the floor partly covered in sawdust and rubbish. This was raked up and sent to a chemist for analysis; and the chemist testified that it was human blood; that the chemical reaction showed that it was human blood.

One Hume testified that on the 11th or 12th of June, a day or two after the homicide, he talked with Nick Morakes. "I asked him, 'Where is Jim to-night?' And Nick said, 'He is gone;' and I said, 'Where has he gone?' and he said he didn't know; and I laughed and said, 'You will have to run Nick off from here,' and he said, no, no, he was disagreeable and couldn't get along with him, and he (Jim) was gone and wouldn't come back any more. And I said, 'Did he go to Atlanta?' and he said he didn't know, he expected may be he did. That was Nick talking to me. The one he was talking about was Jim Morakes. I don't recollect the time of night that occurred—the early part of the night, soon after dark. My store was a few doors below where this 'Busy Bee' café ran."

Henry Richardson, sworn for the State, testified: "I was living in Madison at the time I heard Jim Morakes was dead. I had seen Nick Morakes a few days before that. I saw Nick Morakes on Saturday night before that. I was coming up town on that Saturday night. I live on the Athens road. When I saw Nick he was in an automobile, looked like a Hudson car; a two-seated car. Him and two more men were in that car; all three men sitting in the front seat. I did not see anybody on the back seat. I was coming down the middle of the road. I got on the right-hand side of the road, and the car slowed up, and Nick Morakes called me and said, 'I have just started out to your house. I wanted to get you to make a little trip for me to-night.' He said he was going to South Carolina. He told me he was going over there to steal a girl. He told me he wanted me to drive the car. And I told him I could not go; my wife was sick. He offered me five dollars to make the trip. He said he had a quart of whisky, and he would pay my expenses over there, and give me a good time; and I told him I would love to go and see the country. I said my wife was sick, and I couldn't go on that account. And he said to them other fellows, 'He is a good fellow all right.' I did not know the other fellows that were in the car with him. Mr. Nick was driving the car. I didn't know the other two men.

He said I would come back Sunday night. The other two fellows did not say anything there to Nick in my presence. . . I suppose he thought I was a pretty good negro. It was just about eight o'clock, that Central train was going towards Athens. I was coming towards town. I live on the road to Athens. I was coming to town walking. I was a little over a mile from Madison. He was driving a Hudson car. I had seen him drive a car before, when he had a Buick. The Central train had just gone by. He told me he wanted me to take a trip to South Carolina with him, he was going to steal a girl; and offered me five dollars and expenses. . . There were three men in this car I thought was a Hudson. There was a man in the Ford car—I didn't know who it was. When the Hudson stopped, the Ford stopped behind. Those cars were going out towards Athens. When I got through talking with them Nick went on and turned around, and I came on through the path, and before I got out of the path the car passed; they were on the other side of the church. I saw these same cars turn around and come back this way. In the direct examination you didn't ask me about but one car. I was telling you the way it run it was a Hudson. I don't know who was driving the Ford. I saw a man in it. I don't know whose automobile that was. I never paid it that much attention to know if I had ever seen it before. I can drive some cars—not all. I don't know whose car this one was."

The body of the dead man was found near Columbia, S. C. Documents upon him established his identity. There was evidence that it is over 200 miles from Madison to Columbia, S. C.; and evidence as to the character of the road, some of it showing that parts of the road were not good.

It is strongly urged in the argument that for the defendants to have gone from Madison to Columbia would have required the machine to travel at the rate of 35 miles an hour, and that with a Ford machine this was impossible. We have not undertaken to set forth all of the evidence for the State, and have indicated very little of that introduced by the defendants. As stated above, there were numerous witnesses who testified as to the presence of Nick Morakes in Madison on Sunday, and of John Patros and John Morakes in Atlanta on Sunday, at such an hour as would have precluded the possibility of their being in South Carolina at

the time testified to by Mrs. Rivers and Mr. Watkins. There was evidence to show that Nick Morakes was in Madison between 12 and 1 o'clock Saturday night; and that if he was seen near Columbia, S. C., at 7:45 or 8 o'clock a. m. Sunday, the automobile in which he traveled must have made an average speed of 30 or 35 miles an hour. It is not our purpose to argue the effect of the evidence. That was a question entirely for the jury. We are not prepared to say, in the face of the verdict of the jury, that a Ford machine could not have made the distance between the time when Nick Morakes was seen in Madison Saturday night and the hour he was seen near Columbia, S. C., Sunday morning. We will not take up and consider the question as to whether or not a chemist could, from the small amount of reddish substance furnished him, have determined that it was human blood; especially where it was taken up several weeks after it is supposed to have been spilled upon the floor. That was a question for the jury. It is not for the court to say whether the encounter which the witness Jones described as taking place between Nick Morakes and another party was rough play or a fight. Again, it was for the jury to say whether it was a fight, and a serious fight—a fight that was the prelude to a fatal struggle. The evidence of bad feeling between Nick Morakes and the dead man may be slight. We do not attempt to weigh it; the jury did that. It is not for us to determine whether or not Watkins, in the few seconds elapsing while his machine passed a machine in South Carolina, had time to identify John Morakes and John Patros. That was purely a question for the jury. And so we might go on taking up point after point, and might concede that the evidence, especially points in favor of the State, was not entirely satisfactory; but that only leads to the reiterated and monotonous statement that the jury were the judges of that. The law and the constitution make them such. If Nick Morakes and Jim Morakes had a fight in their restaurant, and Nick Morakes, later in the night, struck and killed Jim Morakes with a blunt instrument, as described in the indictment, then the crime with which he was charged was committed in Morgan County. From all the circumstances proved on the trial the jury could infer that such was the case. And from the other facts proved the jury were authorized to find that the other

two defendants co-operated with him in the accomplishment of the crime.

2. Exception is taken to the following charge to the jury: "The court also charges you, if from all the evidence introduced in this trial it strongly and decidedly tends to show the offense, if any was committed, was committed in the County of Morgan and State of Georgia, and there is no evidence in this case warranting only a bare conjecture, if any was committed, was committed elsewhere, you would be authorized to conclude the offense, if any, was committed in Morgan County, Georgia." It is excepted to on the ground that it is not authorized by the evidence, that it is not correct as a matter of law, in that in effect the jury were instructed that if the evidence strongly and decidedly tended to show that the offense, if any, was committed in the County of Morgan, and there was no evidence to the contrary, the jury would be authorized to find and conclude that the offense, if any, was committed in that county. If this charge alone constituted the only instruction given by the court upon the degree of proof required to establish venue, it might possibly be open to the objections urged. But it has been held that when the evidence introduced on the trial of a criminal case strongly and decidedly tends to show that the offense was committed in the county where the trial was held, and there is no evidence warranting even a bare conjecture that it was committed elsewhere, it will be held that the venue was sufficiently proved. *Hays* v. *State,* 25 *Ga. App.* 591 (103 S. E. 730). The allegations as to venue in the indictment must be proved, as other material allegations, beyond a reasonable doubt; and the court in other portions of the charge most emphatically instructed the jury to this effect. Time and time again in the charge the court instructed the jury in impressive terms that the venue must be proved beyond a reasonable doubt. The court instructed the jury that the allegation as to venue was one of the material allegations in the indictment, and charged them that all of the material allegations in the case must be proved beyond a reasonable doubt. The court instructed the jury as to the burden that rested upon the State where a verdict was sought upon circumstantial evidence, and charged that in such a case the proved facts must not only be consistent with the guilt of the defendants, but must exclude every other reasonable theory ex-

cept the guilt of the defendants. The court charged them, in part: "The constitution of the State of Georgia declares that all criminal cases shall be tried in the county where the crime was committed. Under this provision of the constitution the court charges you that, before you would be authorized to convict the defendants or either of them in this case, you must believe beyond a reasonable doubt that the crime of murder claimed to have been committed in this indictment was committed in the County of Morgan, this State. And unless the State has proven this fact to your satisfaction beyond a reasonable doubt, it would be your duty to acquit the defendants. This would be true even though you believed the defendants committed the crime set out in the indictment in some other county of this State, or in another State. Unless you are satisfied beyond a reasonable doubt that deceased was killed, as alleged in the indictment, in the County of Morgan, the fact, if it be a fact, that you may believe the deceased was killed by the defendants in some other county or State would not authorize you to convict the defendants under this indictment. What is called the venue in a criminal case is a material fact, and must be proved to the satisfaction of the jury beyond a reasonable doubt, like every other material fact in this case; and unless so proved, the jury's bounden duty is to acquit.

"The law of circumstantial evidence and the rule governing it is applicable to the question of venue in this case, with the same degree of force as to any other question in the case. Where the fact of venue is attempted to be proven by circumstantial evidence, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save the guilt of the accused. Applying this rule to the question of venue in this case, the court charges you that before you would be authorized to convict the defendants under the present indictment, the proven facts must not only be consistent with the hypothesis or theory that the crime was committed in Morgan County, but must exclude every other reasonable hypothesis, or theory, save that the crime was committed in Morgan County. And even though you believe that the crime of murder was committed, and committed by these defendants, unless the proved facts satisfy your minds beyond a reasonable doubt that the crime was committed in Morgan County, it would be your duty to acquit

the defendants. Still further, unless the proven facts exclude every other reasonable theory or supposition except that the crime was committed in Morgan County, it would equally be your duty to acquit the defendants.

"In a case of this character each fact necessary to the conclusion sought to be established must be proved beyond a reasonable doubt; and if you have a reasonable doubt as to the existence of any material facts in this case which is necessary to the conclusion which the State seeks to establish, to wit, that the defendants committed the offense of murder in the County of Morgan, as alleged in the indictment, then it would be your duty to acquit the defendants.

"There is still another rule to which the court deems it proper to direct your attention. In this character of case, if there be any material fact proven to the satisfaction of the jury and such fact is inconsistent with the supposition of the guilt of the accused and not in harmony therewith, then there can be no conviction whatsoever, and it would be the duty of the jury to acquit the defendants. The court also charges you, if from all the evidence introduced in this trial it strongly and decidedly tends to show the offense, if any was committed, was committed in the County of Morgan and State of Georgia, and there is no evidence in this case warranting only a bare conjecture that the crime, if any was committed, was committed elsewhere, you would be authorized to conclude the offense, if any, was committed in Morgan County, Georgia. The venue of an offense can be shown by circumstantial evidence; and in the event you reach the conclusion that Jim Morakes was killed as charged in this indictment, and if all the proved facts in this case are consistent with the theory that the offense was committed in Morgan County, Georgia, and excludes every other reasonable theory that the crime was committed in some other county or State, you would be authorized to reach the conclusion that the crime, if any, was committed in this county." In view of this charge upon the subject of venue, there is no merit in the exception to that part of the charge first quoted above in this division.

3. A complaint in a motion for new trial that the verdict is contrary to a stated part of the charge is equal to a complaint that it is contrary to law; and it is without merit where, under the law, the verdict is authorized by the evidence.

4. In the 9th ground of the amendment to the motion for new trial complaint is made of a ruling by the court excluding a part of the evidence of one Ray, who appeared as a witness for the defendants. Defendants offered to prove by Ray that on Tuesday or Wednesday night, after June the 9th, the day upon which it is alleged the defendants committed the crime charged, one Edgar Turner came to the house of the witness for the purpose of hiring his car, and "then and there told the witness that John Morakes, John Patros, and Nick Morakes wanted the car to go to Winder, Georgia. Upon objection of the State that such statement was irrelevant and hearsay, the court excluded from consideration the declaration that the witness swore Turner made to him, to the effect that he wanted the car for these three movants, John Patros, John Morakes, and Nick Morakes, to go to Winder. The court permitted the witness to testify that he left this car out for Turner on Tuesday or Wednesday night after June 9, 1923, but declined to permit him to testify to the above statement that Turner made at the time he sought to hire the car." The evidence excluded was apparently hearsay, and the court did not err in excluding it.

5. The ruling made in headnote 5 requires no elaboration.

6. The evidence, though circumstantial, authorized the verdict against all the defendants.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., and ATKINSON, J., who dissent on the ground that the evidence was insufficient to show the commission of the homicide in Morgan County, the county in which the crime was alleged to have been committed.

GILBERT, J. The evidence as to the guilt of the defendants and as to venue is exceedingly weak, and to me unsatisfactory. The jury, however, are made by law the tribunal to pass upon these questions, and, under the unbroken line of decisions of this court, the jury's finding will not be set aside if there is evidence, though slight, to support it. There is some slight evidence to support the verdict. Therefore I concur in the judgment.